UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/21/2023

RICHARD BLITZ,

                Plaintiff,

      v.

BLDG MANAGEMENT CO., INC., AMY
WOLF, and PAUL HOWARD,

                Defendants.

No. 20-cv-5462 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

      Plaintiff Richard Blitz, a disabled individual, proceeding *pro se*,[1] brings this action against Defendants BLDG Management Company, Inc. ("BLDG"), the manager of his residential apartment building; Amy Wolf, the Assistant Managing Agent and Assistant Vice President of BLDG; and Paul Howard, a BLDG Property Manager. In the main, he alleges that Defendants failed to remedy a significant disturbance he faced due to loud barking by his neighbor's dog at all hours of the day and night which has proceeded unabated for more than seven years, that such failure caused him significant health-related issues, and that this failing further constitutes discrimination on the basis of his disabilities. His Complaint states causes of action against Defendants under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.* Defendants also bring third-party claims against Wendi Newman, Plaintiff's neighbor and the owner of the barking dog, seeking indemnification, to the extent Defendants are held liable on any of Plaintiff's causes of action.

      Now before the Court are Defendants' motion for summary judgment, Plaintiff's cross

---

[1] Plaintiff was assisted in preparing his filings on the present motions by the NYLAG Legal Clinic for Pro Se Litigants in the Southern District of New York.

motion for summary judgment, and Third-Party Defendant Newman's motion for summary judgment on Defendants' third-party claims for indemnification.  For the reasons which follow, Defendants' motion is granted, Plaintiff's motion is denied, and Defendants' third-party claims for indemnification against Newman are accordingly dismissed as moot.

## BACKGROUND

The following facts are taken from the parties' Local Civil Rule 56.1 statements and are undisputed unless otherwise specified.  Plaintiff Blitz is a tenant in the rent-stabilized Unit 5D (the "Unit") of a residential apartment building located at 220 East 63rd Street, New York, NY (the "Building").  Def's 56.1 ¶ 1.  Wendi Newman is Plaintiff's next-door neighbor, and resides in Unit 5C.  *Id.* ¶ 4.  Newman, who is also disabled, applied to the Building's prior owner for a reasonable accommodation of maintaining a dog as a companion in her apartment, and that application was granted.  *Id.* ¶ 5.  Newman's current dog, Mokie, began living with her in 2014.  *Id.* ¶ 7.

### I.     Disturbances Related to Mokie's Barking

Beginning as early as 2016, Plaintiff and Newman corresponded about the issue of Mokie's barking.  *Id.* ¶ 8.  Plaintiff's first letter to Newman notified her that, during the previous night, Mokie had barked "loudly and continuously out of control for almost 3 hours between 6 PM and 9 PM," and further claimed that Newman had not been cooperative about controlling Mokie's barking, although Plaintiff had been "calm, polite, and civil in [his] conversations with [her], as [he] only want[s] a peaceful relationship."  *Id.*  Plaintiff claimed that the barking constituted an "emergency" which was making him "physically ill."  Howard Decl. ¶ 15, Ex. 10 (copy of the handwritten letter).  Newman responded in writing two weeks later, apologizing "for any disturbance" caused to Plaintiff on the evening in question.  *Id.* ¶ 16, Ex. 11.  In December, Newman sent another note to Plaintiff asking if he would like to "get together for a coffee over the

2

weekend, or at [his] convenience, to figure out together the best way to live as neighbors amicably—dog and all." *Id*. ¶ 17, Ex. 11. She concluded by noting that she "always had a nice relationship with [Plaintiff's] parents & would like to continue that tradition." *Id*.

Although Newman and Plaintiff were apparently able to engage in a frank and productive dialogue regarding Mokie's barking initially, further communication about the subject eventually deteriorated into a feud between the two neighbors. That feud, in turn, gave way to litigiousness, culminating in a seven-year effort by Plaintiff to sue BLDG and certain of its employees for their handling of the alleged nuisance.

Several facts about the situation are plainly undisputed. Mokie's barking, for instance, did present a significant disturbance for Plaintiff and other tenants in the Building. As Plaintiff's filings amply demonstrate, the record is replete with documented complaints about the disturbance Mokie's barking caused to multiple Building residents—each of whom, notably, are uninvolved in this action, and some of whom no longer even reside in the Building. To take one example, in January 2015, the tenant in Unit 5B emailed Defendant Amy Wolf, BLDG's Assistant Managing Agent, saying that she needed assistance because:

> the dog in 5C is constantly barking. It barks all the time, but the most disturbing is every night at 10pm. Last night, it was barking on and off up to 1am. I have to be at work at 7am and the dog is constantly waking me up. It's very loud! I contacted the doorman several times to complain. I had to contact him twice last night to contact her. When she goes out the dog just barks until she returns.
>
> I tried to be nice and talk to the owner rather than contacting the management company. I have let this go on for a while, but it just seems to be getting worse instead of better. I'm gone half the time, but it[']s out [of] control when I am here.
>
> Can you advise? I just don't know what else to do, it's very upsetting. Some barking is totally fine, but it's constant and at all hours.

Pl. Decl. ¶ 34, Ex. 1 at 2. The next month, the same tenant again emailed Wolf, noting:

> I wanted to know if you had an update on this. The dog is out of control and the

owner refuses to do anything about it.  It's barking right now.

It's very hard to live next to this.  I had a friend over for dinner and the dog barked the entire time.  It's very loud every day.  I was working from home on the snow day and it barked on and off the whole day.  I called the doorman twice.  Also, the dog goes ballistic anytime someone walks next to it in the hall way.

*Id*. ¶ 35, Ex. at 1.  That tenant moved out of the Building soon after the follow-up email.  *Id*. ¶ 36.

This experience was, unfortunately, far from unique, and appears to have continued unabated for years.  *Id*. ¶¶ 37–54.  In June 2018, for instance, a tenant in Unit 4C (downstairs from Newman's apartment) sent an email to BLDG employees Paul Howard, Christopher Zapata, and Amy Wolf, stating, in relevant part:

[E]ver since I moved in (May 15), a dog directly above me (probably in 5C) has barked incessantly from 6am on.  It seems the owners leave, not realizing that their dog barks for 3+ hours straight.  It wakes me every morning and continues barking until I leave the apartment at 8:30am.  I assume it continues barking long after that.

Is there anything you all can do to help remedy this situation?  It's such a shame for a noise disturbance to ruin my experience in such a well-maintained building.

*Id*. ¶ 38, Ex. 2.  A subsequent email in January 2019 from the 4C resident indicated that the "dog in 5C has been barking incessantly for the past month" and "frequently wakes [him] up around 2:30am," "runs around the apartment and barks for nearly a half hour," and that this situation had "caused extreme detriment to my sleep and therefore, my work performance and overall mental health."  *Id*. ¶ 40, Ex. 2 at 6.  This experience also comported with repeated complaints the Building received from a new tenant of Unit 5B in 2022, noting that Mokie's "barking is **incessant**—so much so that [the tenant] shared in the past that [she] returned to the office despite having work from home flexibility because [she] found it so aggravating and disruptive."  *Id*. ¶ 46, Ex. 3 at 4 (emphasis in original).  The nuisance was so severe that the tenant eventually chose not to renew her lease because of the barking—apparently the second such tenant to depart Unit 5B due to Mokie's barking—saying she was "forced to vacate because of [her] neighbor's inability to control

4

her animal." *Id*. Even after the Building offered to "soundproof [the] common wall" to try to entice the 5B resident to renew her lease, she declined, noting that the "barking carries throughout the entire apartment—the living room, bedroom and bathroom." *Id*. ¶ 48, Ex. 3 at 1.

The record evidence also amply demonstrates that Plaintiff Blitz himself voiced complaints regarding Mokie's barking.  He first appears to have written to BLDG employees in November 2016, noting that he could "no longer tolerate the out of control continuous loud barking of the dog owned [by his] neighboring tenant," had been "suffering every day," and "fear[ed] for his health" given the nuisance it caused.  Pl. Decl. ¶ 59, Ex. 4.  Later that same month, Plaintiff created what purports to be a logbook of 74 separate instances of Mokie's barking over the course of a single day.  *Id*. ¶ 60, Ex. 4 at 3.  Plaintiff affirms that he has "produced nearly 100 logbooks" with "thousands" of such entries.  *Id*.  At the request of BLDG employees, Plaintiff also repeatedly called the front desk of the Building to lodge complaints related to the barking; a logbook of such calls indicates Plaintiff calling many times per day—often only minutes apart—to notify the doormen of the disturbance.  *See, e.g., id*. ¶ 61, Ex. 5.  Subsequent correspondence from Plaintiff to BLDG regarding the situation is similarly well documented, *see, e.g., id*. ¶¶ 62–72, and indicates that Plaintiff evidently was "diagnosed to be suffering from sleep deprivation along with anxiety form [sic] the loud constant barking" following several "emergency visit[s]" to the hospital, *id*. ¶ 64, Ex. 9.

## II.     **Disturbances Related to Plaintiff's Behavior**

The record also demonstrates, however, that, over much of the same period, BLDG received repeated complaints related to Plaintiff Blitz engaging in disruptive behavior, including yelling, banging on walls, and playing excessively loud music.  Def's 56.1 ¶¶ 17–27.  BLDG received complaints that Plaintiff screamed at residents and even that he was barking through the

walls at Newman and other tenants.  *Id.* ¶¶ 19, 21, 27.  Newman herself complained that Plaintiff banged on the walls with sticks or other objects, screamed insults at her through the walls, slammed his doors, and harassed her in the hallway.  *Id.* ¶¶ 20–21.  Some of these encounters were apparently so disturbing that Newman called the police about Plaintiff's behavior several times.  *Id.*  After BLDG made entreaties to Plaintiff requesting that he cease disruptive behavior, *see, e.g., id.* ¶ 22, in July 2021, BLDG served Plaintiff with a Ten (10) Day Notice to Cure based on his objectionable conduct, *id.* ¶ 28, Ex. 26.

### III.    Prior Legal Action

In light of the many complaints BLDG received regarding Mokie's barking, on May 21, 2017, it issued Newman a Notice to Cure, noting that the barking was "very annoying and disturbing to other tenants," and requiring Newman to cure on or before the end of the month. Howard Reply Decl. ¶ 3, Ex. 41.  Given Newman's apparent failure to remedy the situation, thereafter, on July 24, 2017, BLDG served a Notice of Termination, purporting to terminate her lease as of August 17, based on Newman's failure to control Mokie's barking.  *Id.* 4, Ex. 42.  In September 2017, BLDG then commenced an eviction proceeding against Newman in New York City Housing Court, seeking a judgment of possession and a warrant of eviction.  *Id.* ¶ 5, Ex. 43. That proceeding was adjourned on consent to November 2017, and, "given the difficulties of terminating a long-term, rent regulated tenancy based on the legal theory of nuisance," as well as "the parties' discussions in which Newman agreed to control Mokie's barking through obedience training," was ultimately discontinued without prejudice.  *Id.* ¶ 7, Ex. 44.

Meanwhile, on May 25, 2017, an attorney with New York Lawyers for the Public Interest (NYLPI) wrote a letter to BLDG on Plaintiff's behalf entitled "Request for Reasonable Accommodation."  Pl. Decl. ¶ 73, Ex. 10 (the "May 2017 Request Letter").  That letter stated, in

relevant part, that Plaintiff was seeking "an accommodation for his disability" given the effect Mokie's barking was having on him, including the "exacerbation of his anxiety," "dangerous increases in [his] blood pressure," and his "being admitted to [the] hospital three times in recent months." *Id*. The letter requested that Plaintiff be transferred "to a similar, rent-regulated apartment elsewhere in the Building without increasing Mr. Blitz's monthly rent," and that Plaintiff was "also open to discussing other options for accommodating his disability." *Id*.

Plaintiff ultimately brought suit against Defendant BLDG, the Building's owner, for its alleged mismanagement of the disturbance caused by Mokie's barking and purported failure to accommodate him. On August 21, 2018, Plaintiff filed a proceeding against BLDG in the Civil Court of the City of New York. *See* Index No. L&T 6165/2018 (the "Housing Court Action"). In that action, he alleged that BLDG "caused or permitted acts/omissions that substantively interfered with or disturbed [his] comfort, peace or quiet" based on the alleged excessive barking of Mokie. Def's 56.1 ¶ 11; Howard Decl. ¶ 19, Ex. 12 ¶ 5. The Housing Court Action was eventually resolved by a stipulation of settlement executed between Plaintiff, BLDG, and Newman, and so-ordered by Judge Stoller on May 8, 2019 (the "Housing Court Settlement"). *See id.* ¶ 13, Howard Decl. ¶ 21, Ex. 13. That settlement required BLDG to "make best efforts to persuade the tenant of apartment unit 5C to make use of a bark collar and other methods to eliminate or reduce the level in terms of volume and the frequency of barking within 1 week of [the] stipulation." *Id.*, Ex. 13 ¶ 2.

Accordingly, the next day, on May 9, 2019, BLDG served Newman a letter demanding that she "eliminate the issue" of any excessive barking. Howard Decl., Ex. 14. The letter specifically "suggested that [Newman] use a 'bark collar' or any other method" to resolve Mokie's excessive barking, and admonished her that it was her "responsibility as the owner of the dog, to take whatever steps are needed in order to resolve this alleged issue." *Id*. Newman's counsel responded

by letter to BLDG on May 21, 2019.  In relevant part, her attorney explained:

> Ms. Newman has already spent considerable resources on steps including training, paying for doggie day care to get her dog out of the apartment when she is gone for more than three hours or when her housekeeper comes, getting a white noise machine, and putting down carpeting throughout the apartment.  Her dog has completed training up to the Canine Good Citizen level and is registered with the AKC as such.  She is also working with a certified animal behaviorist, who evaluated her dog and concluded that there was no barking issue, but recommended using a "snoot loop" halter to further minimize any barking and keep her dog calm in situations like when Mr. Blitz is loudly screaming.

Def's Mem., Ex. 15.

Believing the situation had not been remedied by the actions taken by BLDG and its employees following the Housing Court Settlement, Plaintiff, proceeding *pro se*, then brought this action against BLDG, Wolf, and Howard in July 2020.  *See* Dkt. 1.  This Court held an initial pretrial conference in December 2020, and the action was referred to Magistrate Judge Lehrburger for general pretrial issues and settlement negotiations.  *See* Dkts. 14, 16, 41.  In January 2021, Defendants filed a Third-Party Complaint against Newman, seeking common law or contractual indemnification in the event Defendants were held liable on any causes of action brought by Plaintiff.  *See* Dkt. 19.

On May 11, 2021, following a settlement conference, Magistrate Judge Lehrburger issued an order requiring the parties to "cooperate in good faith" so that Plaintiff could view certain available apartments Defendants discussed at the conference, and further requiring Defendants to complete an investigation into "the feasibility of an apartment move solution that is financially neutral (or any other options that BLDG may suggest)."  Dkt. 50.  Accordingly, this action was stayed on May 12, 2021 to allow the parties to attempt to resolve the dispute.  *See* Dkt. 53.

Shortly thereafter, in June 2021, the record demonstrates that BLDG paid to install soundproofing into the walls of Newman's apartment in Unit 5C.  Howard Decl. ¶ 47, Ex. 33.  It

then proceeded to offer several accommodations to Plaintiff, each of which he ultimately refused. When installing soundproofing materials in Newman's apartment, for instance, BLDG offered to install soundproofing in Plaintiff's apartment in order to reduce exterior noise, but Plaintiff repeatedly declined the offer and rejected BLDG's follow-up communications about the option. Howard Decl. ¶¶ 48–54, Exs. 34–38.  So too, when BLDG offered Plaintiff the opportunity to lease any one of more than a dozen similar units in the Building, or at a different residential apartment building on 36th Street, Plaintiff refused as well.  Def's 56.1 ¶ 42, Ex. 39, 40.  Notably, one of the apartments offered, Unit 6J in the Building, was rent-stabilized, but Plaintiff refused to be moved into the unit except on the condition that BLDG would further subsidize his rent. Howard Decl. ¶ 57.

In light of Plaintiff's unwillingness to accept the offered accommodations, at the request of the parties, the stay in this action was lifted in July 2021.  *See* Dkt. 59.  The discovery timeline was repeatedly extended, and, in January 2023, Defendants filed their motion for summary judgment.  *See* Dkt. 111.  Plaintiff's cross motion and opposition were filed in April, *see* Dkt. 129, and the motions were fully briefed in June.

## LEGAL STANDARD

A party is entitled to summary judgment when the undisputed material facts warrant judgment in its favor as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate "if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law."  *Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486, 490 (S.D.N.Y. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  On a motion for summary judgment, the Court must "construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

To survive a summary judgment motion, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zentih Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, they must produce sufficient admissible evidence from which a reasonable factfinder could find in the nonmovant's favor. *Id.*; *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (a party opposing summary judgment "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). "Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact," *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) (cleaned up), and a nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," *Liberty Lobby*, 477 U.S. at 256. Put differently, "[w]hen a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is a 'genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248.

## DISCUSSION

For the reasons set forth below, on this record, no reasonable juror could find in favor of Plaintiff Blitz on any of his causes of action. Accordingly, Defendants' motion for summary judgment is granted, and Plaintiff's motion denied.

The Court's treatment of each of the claims at issue will proceed as follows: First, the Court finds that Plaintiff's claims brought under the ADA are foreclosed as a matter of law, given that Defendants do not qualify as entities which may be sued under that statute.  Second, the Court concludes that Plaintiff's claims brought under the FHA also fail, given that the undisputed evidence in the record indicates that Defendants offered him the reasonable accommodations required by law.  Third, having determined that Defendants prevail against Plaintiff's FHA claims in any event, the Court finds that it need not reach the merits of Defendants' arguments in the alternative that certain prudential doctrines preclude Plaintiff from bringing his FHA claims in this action.  Fourth, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, to the extent that his Complaint states any given the liberal construal afforded to *pro se* pleadings.  Finally, the Court dismisses Defendants' third-party claims seeking indemnification from Newman as moot, given that Defendants are not liable on any of Plaintiff's causes of action.

## I.      Defendants are Entitled to Summary Judgment on the ADA Claims

Although the ADA is broad in its remedial effects, it is notably limited by the scope of the entities to which it applies.  Title I of the ADA governs large employers, *see* 42 U.S.C. § 1211, *et seq*., Title II governs public entities, *see id*. § 1213, *et seq*., and Title III governs public accommodations, *see id*. § 12181, *et seq*.  Neither a private individual nor a residential facility, such as an apartment is either a "place of accommodation" within the meaning of Title III of the ADA, or a "public entity" pursuant to Title II.  *Noe v. Ray Realty*, 2020 WL 506459, at *1 & n.1 (S.D.N.Y. Jan. 31, 2020) (dismissing ADA claims, reasoning that the ADA does not apply to private landlords).  Because Defendants here do not fall within the reach of the ADA, Plaintiff may not bring his ADA claims as a matter of law.

While acknowledging the ADA's limited reach, Plaintiff argues, *inter alia*, that he

nevertheless may bring ADA claims against Defendants here because BLDG is either a "public entity" or a "place of accommodation" under that statute by virtue of the fact that it accepts Senior Citizen Rent Increase Exemption Program ("SCRIE") tax credits from the New York City Department of Finance, a program Plaintiff further alleges to be federally funded.  This argument is unavailing.  As an initial matter, any SCRIE tax benefits are funded by New York City, and Plaintiff's allegation that he believes the dollars to be federal in nature, without factual support in the record, is merely speculative.[2]  Regardless, Plaintiff does not cite to any authority suggesting that a private entity which receives federal subsidies qualifies as a "public entity" or "place of accommodation" within the meaning of the ADA.  To the contrary, courts have found the opposite to be the case.  *See Ayyad-Ramallo v. Marine Terrace Assocs. LLC*, 2014 WL 2993448, at *5 (E.D.N.Y. July 2, 2014) ("[T]he ADA does not apply to private landlords, even if the premises are used for public subsidized housing."); *Reyes v. Fairfield Props.*, 661 F. Supp. 2d 249, 264 n.5 (E.D.N.Y. 2014) (finding that "receipt of Section 8 housing vouchers is an insufficient basis upon which to deem the premises—a private, residential apartment complex—a place of public accommodation"); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1293 n.2 (11th Cir. 2005) (noting that the "Supreme Court has repeatedly held … that federal money does not transform private persons or entities into state actors," and collecting cases).  Thus, even were the Court to assume that Plaintiff is correct that BLDG receives federal dollars via the SCRIE program, such funding would not transform the private residential apartment building into a "public entity" against which an ADA claim may be brought.

Accordingly, because Defendants are not entities covered within the meaning of the ADA,

---

[2]     SCRIE provides landlords with a tax exemption benefit where it foregoes increasing rent amounts on senior citizens.  *See* "Housing Support," New York City Dep't for the Aging, available at: https://www.nyc.gov/site/dfta/services/housing-support.page.

Defendants' motion for summary judgment on Plaintiff's ADA claims is granted.

## II.    Defendants Are Entitled to Summary Judgment on the FHA Claims

The FHA applies to any "dwelling," which includes "any building … designed or intended for occupancy as a residence by one or more families," 42 U.S.C. § 3602(b), and broadly makes it unlawful "to discriminate against any person" on the basis of, among other things, "a handicap," 42 U.S.C. § 3604, *et seq*.  BLDG does not contest that it is bound by the FHA's demands given its operation of the Building.  *See* Def's Mem. at 11.

"A plaintiff may show that a defendant has engaged in discrimination proscribed by the FHA … under 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make reasonable accommodation.'"  *Wilson v. Wilder Balter Partners, Inc*., 2015 WL 685194, at *7 (S.D.N.Y. Feb. 17, 2015).  The Act also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed … any right granted or protected by section … 3604," 42 U.S.C. § 3617, the basis of a so-called retaliation claim.  The Court here liberally construes Plaintiff's *pro se* Complaint as alleging two theories of discrimination under the FHA—failure to accommodate, and disparate treatment—as well as a claim of retaliation under that statute.  Each of those claims is addressed below in turn; for the reasons which follow, on this factual record, no reasonable juror could find in Plaintiff's favor on any of his FHA claims.

### A.  Plaintiff's Claims of Discrimination by Failure to Accommodate Fail

First, the FHA prohibits the "refusal to make reasonable accommodations in rules, policies, practices, or services" when necessary to allow a disabled individual "equal opportunity to use and enjoy a dwelling."  *Id*. § 3604(f)(3)(B).  To state a prima facie case for "failure to reasonably accommodate, a plaintiff must demonstrate that: (1) he suffers from a handicap as defined by the

FHAA; (2) the defendant knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." *Sinisgallo v. Town of Islip Housing Auth.*, 865 F. Supp. 2d 307, 336 (E.D.N.Y. 2012). "The Second Circuit has defined a reasonable accommodation as one that gives the otherwise qualified plaintiff with disabilities meaningful access to the programs or services sought." *Id*. at 341 (cleaned up) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003)). "Whether a requested accommodation is required under the FHAA is highly fact-specific, requiring case-by-case determination." *Freeland v. Sisao LLC*, 2008 WL 906746, at *3 (E.D.N.Y. Apr. 1, 2008) (cleaned up). A classic example is that courts have frequently held that a mobility-impaired resident's request to move from an upper-floor apartment to a lower-floor apartment to be a cognizable request for a reasonable accommodation under the FHA. *See, e.g., Logan v. Matveevskii*, 57 F. Supp. 3d 234, 261–65 (S.D.N.Y. Sept. 29, 2014); *Bezi v. Camacho*, 2012 WL 5519386, at *5, *17 (C.D. Cal. Sept. 27, 2012); *Bentley v. Peace and Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 345–46 (E.D.N.Y. 2005); *Roseborough v. Cottonwood Apts.*, 1994 WL 695516, at *2–3 (N.D. Ill. Dec. 9, 1994).

Here, even assuming that prongs one through three of a failure to accommodate claim have been satisfied, the record forecloses a finding in Plaintiff's favor on the fourth, given that Defendants offered each of the reasonable accommodations Plaintiff sought. By either his May 2017 Request Letter or his Complaint in the instant action, Plaintiff had requested two accommodations due to issues Mokie's barking allegedly caused him given his disabilities. First, in 2017, he sought "that the Building's owner transfer Mr. Blitz to a similar, rent-regulated apartment elsewhere in the Building without increasing Mr. Blitz's monthly rent." Howard Decl.,

Ex. 45 at 1.  Second, by his Complaint filed in this action in 2020, he requested, "alternatively, installation by BLDG Management of sound proofing material that overcomes the barking of Ms. Newman's dog."  Compl. at 11 ¶ 1.

### 1. Defendants Offered the Accommodation of Other Suitable Apartments

The record demonstrates that BLDG offered Plaintiff the opportunity to move to another of its managed apartments on multiple occasions following his request for an accommodation.  In January 2021, for instance, BLDG offered Plaintiff a list of available apartments and their corresponding rents, and asked that he inform BLDG if he wished to move to one of those units. Howard Decl. ¶¶ 55, 56; Exs. 39, 40.  The first such offer letter stated, in relevant part:

> I understand that you do not wish to continue to reside in your current apartment [unit 5D] because of its proximity to apartment 5C.  We have several comparable units available for rent in 220 East 63rd Street.  Please review the attached list, which contains the apartment unit number, configuration, approximate square footage and the monthly rent at which the unit is offered.  We offer to rent any of these units to you, except those on floors 4, 5, or 6 or any on the "B," "C" or "D" lines, as they are contiguous lines and/or floors to unit 5C.  For any non-stabilized units, we offer you a waiver of two (2) months' rent upon your signing of a one (1) year lease or a waiver of four (4) months' rent upon your signing of a two (2) year lease.

Howard Decl., Ex. 39 at 1.  The letter then included an attachment containing available units similar to Unit 5D within the Building:

| APT # | SIZE | SQ. FT. | RENT | STATUS |
|---|---|---|---|---|
| LOBA | 1BDR | 537 sq. ft. | $3173.53 | RS |
| 11M | Studio | 539 sq. ft. | $2995 | FM |
| 2P | Studio | 559 sq. ft. | $2795 | FM |
| 7M | 1 BDR | 640 sq. ft. | $3775 | FM |
| 2G | 1 BDR | 752 sq. ft. | $3775 | FM |
| 3G | 1 BDR | 752 sq. ft. | $3775 | FM |
| 9G | 1 BDR | 752 sq. ft. | $3800 | FM |
| 9H | 1 BDR | 747 sq. ft. | $3800 | FM |
| 9J | 1 BDR | 753 sq. ft. | $3800 | FM |
| 1L | 1 BDR | 769 sq. ft. | $3450 | FM |
| 8J | 1 BDR | 753 sq. ft. | $3775 | FM |
| 12G | 1 BDR | 743 sq. ft. | $3875 | FM |
| 1H | 1 BDR | 747 sq. ft. | $3325 | FM |
| 2H | 1 BDR | 747 sq. ft. | $3775 | FM |
| 6L | 1 BDR | 769 sq. ft. | $3775 | FM |
| 4P | Studio | 559 sq. ft. | $2895 | FM |
| 5K | 1 BDR | 830 sq. ft. | $3775 | FM |
| 5E | 1 BDR | 836 sq. ft. | $4075 | FM |
| 9F | 1 BDR | 750 sq. ft. | $3800 | FM |

*Id*. at 2.  After Plaintiff failed to respond, he was then offered two additional apartment options,

both of which were rent-stabilized—one on 36th Street, and one elsewhere in the Building, Unit

6J.  Howard Decl. ¶ 56.  Nevertheless, Plaintiff rejected each of these offers as well.  He declined

to tour the apartment on 36th Street because he purportedly did not want to move to another

neighborhood given that he wished to maintain close proximity to his physicians near East 63rd

Street, *id*.; and he rejected Unit 6J given that BLDG did not offer to subsidize the rent to match

the monthly price he then paid for Unit 5D, *id*.  BLDG memorialized Plaintiff's refusal of the

offered units, among other things, in a letter sent in January 2022, again reiterating its offer of the

rent-stabilized Unit 6J:

> BLDG also offered you a chance to move in comparable Apartment 6J in your
> building at its stabilized rent (then $1,957.06, now $1987.95) and a comparable
> apartment located at 236 East 36th Street.  You declined to tour the 36th Street unit,
> and you declined to move into Apartment 6J at the stabilized rent unless that rent
> were reduced to the amount you pay for your current apartment ($1,392.84 after a
> SCRIE abatement).  BLDG hereby reconfirms that Apartment 6J remains available
> at the rent of   $1987.95 . . . .

Howard Decl., Ex. 40 at 1.  Plaintiff does not dispute that he was repeatedly offered the above-

mentioned units following his request for an accommodation.  *See* Pl. 56.1 Resp. at ¶ 20.  Nor is

it disputed that, "[s]ince at least 2016, the Building has not had a vacant apartment with a rent that

is equal to or lower than Plaintiff's current rent."  Def. 56.1 ¶ 45; Howard Decl. ¶¶ 58, 63.

Even assuming Plaintiff was entitled to the reasonable accommodation of a similar

apartment within the Building given his desire to remain close to his doctors near East 63rd Street,

he *was* offered such accommodation by BLDG when it repeatedly offered him Unit 6J—and,

indeed, 19 other similarly-situated units in the Building, as depicted above.  *See* Howard Decl,

Exs. 39, 40.  Plaintiff's sole argument regarding such accommodation is evidently that he was not

offered any of those units at the same, or lower, rent that he currently pays for Unit 5D given his

SCRIE benefit.  But, critically—and contrary to Plaintiff's insistence in his opposition briefing—

as a matter of law, landlords are under no obligation to subsidize a disabled individual's rent or to provide economic assistance in offering a reasonable accommodation under the FHA.  *See, e.g., Marks v. BLDG Mgmt. Co*, 2002 U.S. Dist. LEXIS 7506, at *7 (S.D.N.Y. Apr. 26, 2002) ("[A]n accommodation is not 'necessary' to afford a disabled person access to equal housing opportunity when the accommodation sought does not directly ameliorate an effect of the disability.  In other words, the FHA does not require defendants to waive generally applicable policies when such policies negatively affect disabled individuals for reasons unrelated to their disability.").  Put differently: courts differentiate between reasonable accommodations to which an individual is entitled under the FHA and economic benefits offered to alleviate an individual's general financial hardship.  Indeed, the Second Circuit has specifically held that the FHA does not require landlords to offer accommodations in order to alleviate economic burdens above and beyond reasonably accommodating an individual's disability.  *See Salute v. Stratford Greens Garden Apts*., 136 F.3d 293, 301 (2d Cir. 1998).

In *Salute*, the Circuit confronted an action brought by disabled plaintiffs who received rental subsidies through the Section 8 housing voucher program.  The plaintiffs sought to lease apartments from the defendant, were turned away because of the defendant's policy of refusing to rent to Section 8 recipients, *id*. at 296, and claimed that the defendant's "refusal to reasonably accommodate them by accepting their Section 8 certificates violated the FHA," *id*. at 300.  The Court rejected the notion that the plaintiffs were "entitle[d] to an accommodation that remedies their economic status" under the FHA.  *Id*.  "We think it is fundamental," the Circuit observed, "that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps."  *Id*. at 301.  Because the plaintiffs in *Salute* had sought "to use [the FHA] to remedy economic discrimination of a kind that is

practiced without regard to handicap," their theory of discrimination by way of a failure to offer

reasonable accommodations was without merit.  *Id*.  The Circuit continued, reasoning that

> Congress could not have intended the FHAA to require reasonable
> accommodations for those with handicaps every time a neutral policy imposes an
> adverse impact on individuals who are poor.  The FHAA does not elevate the rights
> of the handicapped poor over the rights of the non-handicapped poor.  Economic
> discrimination … is not cognizable as a failure to make reasonable accommodations
> in violation of § 3604(f)(3)(b).

*Id*. (citing 42 U.S.C. § 3604(f)(3)); *see also Marks*, 2002 WL 764473, at *19 (S.D.N.Y. Apr. 26,

2002) (noting that *Salute* held that "the FHAA does not require reasonable accommodations for

poor people who happen to be disabled whenever a neutral policy has an adverse impact on all

poor people," and collecting cases).  As Judge Karas more recently explained in *Logan v.*

*Matveevskii*,

> In this context, 'equal opportunity' can only mean that handicapped people must be
> afforded the same (or 'equal') opportunity to use and enjoy a dwelling as non-
> handicapped people, which occurs when accommodations address *the needs*
> *created by the handicaps*.  If accommodations go beyond addressing these needs
> and start addressing problems not caused by a person's handicap, then the
> handicapped person would receive not an 'equal' but rather a better opportunity to
> use and enjoy a dwelling, a preference that the plain language of [the FHA] cannot
> support.

57 F. Supp. 3d at 263–64 (emphasis in original); *see also Bryant Woods Inn, Inc. v. Howard Cnty.,*

*Md.*, 124 F.3d 597, 604 (4th Cir. 1997) ("The FHA does not require accommodations that increase

a benefit to a handicapped person above that provided to a nonhandicapped person with respect to

matters unrelated to the handicap.").

The same logic applies with equal force here, and BLDG was not required to further

subsidize Plaintiff's rent in the offered rent-stabilized apartment 6J, nor to otherwise offer him a

financial benefit not available to other tenants, in order to reasonably accommodate his disability.

(Notwithstanding that they were under no legal obligation to do so, the Court notes that BLDG

nevertheless did, in fact, offer to waive two months' rent on a one-year lease, or four months' rent on a two-year lease.  *See* Howard Decl., Ex. 39 at 1.)

Although understandable that Plaintiff would prefer that Defendants offer him a comparable apartment to Unit 5D at the same or lower rental price than what he currently pays by virtue of his SCRIE benefit, such a generous accommodation is not one that the FHA requires Defendants to make.  Accordingly, given the undisputed facts supported by the record, no reasonable juror could find in favor of Plaintiff on his first failure to accommodate theory, and Defendants are thus entitled to summary judgment.

### 2.  Defendants Offered the Accommodation of Soundproofing

As an initial matter, it is at the very least unclear whether soundproofing qualifies as a "reasonable accommodation" under the FHA.  Indeed, some persuasive authority suggests that BLDG was under no obligation to soundproof Plaintiff's apartment, as "wholly new construction or modifications of existing premises is not mandated by the reasonable accommodations provision of the FHAA."  *Reyes*, 661 F. Supp. 2d at 259 (collecting cases); *Rodriguez v. 551 West 157th St. Owners Corp.*, 992 F. Supp. 385, 387 (S.D.N.Y. 1998) ("[P]laintiffs cite no case, and the Court is aware of none, interpreting section 3604(f) to require a landlord to undertake wholly new construction.").  Judge Rakoff explained his rationale in *Rodriguez* by noting the distinct requirements mentioned by the reasonable accommodations subsection of the FHA: the "plain language of the statute defines this requirement in terms of reasonable accommodations in 'rules, policies, practices, or services,' 42 U.S.C. § 3604(f)(3)(B) and, by contrast with § 3604(f)(2) [(encompassing discrimination claims)], notably fails to mention 'facilities.'"  992 F. Supp. at 387. And at least one federal court of appeals has found that soundproofing, specifically, comprises a "fundamental alteration" that cannot qualify as a "reasonable accommodation" under the FHA.

19

*See Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1047 (6th Cir. 2001) ("Soundproofing the entire apartment would amount to such a fundamental change.  As such, Groner has not shown that this would have been a reasonable accommodation.").

But, regardless, even though it may not have been under any legal requirement to do so, the undisputed evidence demonstrates that BLDG did soundproof Newman's apartment to counteract Mokie's barking, and further offered to soundproof Plaintiff's apartment as well—repeatedly.[3]  On June 25, 2021, for instance, BLDG paid City Skyline more than $1,700 to install soundproofing panels to Newman's walls in Unit 5C.  *See* Howard Decl. ¶ 47; Ex. 33 (invoice for "specialty" services, including "sound proof wall inside occupied apartment," "supply and install 1 inch metal furring channel," and "supply and install 5/8 quite rock sound proof boards").  Several weeks letter, BLDG then informed Plaintiff by letter that it would install the same soundproofing material inside his apartment, Unit 5D, as well, and requested that Plaintiff propose dates when the work could be completed.  *See id.* ¶ 48; Ex. 34.  After Plaintiff failed to respond with proposed dates, BLDG sent a second letter, again requesting that he provide dates for the soundproofing work.  *See id.* ¶ 50; Ex. 35.  Once again, Plaintiff did not reply.  *See id.* ¶ 51.  Finally, on November 8, 2021, BLDG sent a third letter, proposing its own dates to perform the work, and noting:

> We are and have been ready, willing and able to perform the soundproofing of your wall shared with apartment 5C, however you have not responded with access dates to our previous communications.  We therefore are advising you that our contractor will be at your apartment at 9:00 AM on Tuesday, 11/16/2021.  This project will take approximately 3 days to complete.

*Id.* ¶ 52; Ex. 36.  Plaintiff responded via fax, refusing to grant access: "I am not going to risk my

---

[3]      Plaintiff's latest declaration appears to undercut his own request for soundproofing, now noting that the installation of soundproofing couldn't ameliorate the issue of Mokie's barking.  *See id.* ¶ 50 ("[O]viously soundproofing will not suffice in ameliorating Mokie's intense and incessant barking.").  Because he seeks soundproofing in his Complaint and raises multiple arguments regarding BLDG's purported failure to provide the same, however, the Court treats his arguments for failure to accommodate on the merits.

life for your agenda by having strange men working in my apartment for any length of time, let alone 3 days.  I consider your bullying tactics of giving me ultimatums as further retaliation . . . ."  *Id*. ¶ 53; Ex. 37.

Perhaps in light of these undisputed facts demonstrating that soundproofing was, in fact, offered, Plaintiff now raises a new argument in response.  He appears to claim that, in any event, BLDG's delay in offering soundproofing constitutes a constructive failure to provide reasonable accommodations.  *See* Pl. Decl. ¶ 49 (stating "it still took six years before BLDG Management offered me the same soundproofing" allegedly offered others).  This, too, is unpersuasive.  "In assessing whether a defendant has constructively denied a plaintiff's request for an accommodation through unreasonable delay, courts often consider whether the delay was caused by the defendant's unreasonableness, unwillingness to grant the requested accommodation, or bad faith."  *Logan*, 57 F. Supp. 3d at 257.  This is a high bar—the Court in *Logan* observed that the standard is "analogous" to the one used when assessing "an employee's claim that an employer has constructively denied the employee's request for a reasonable accommodation through delay," and that "courts in the Second Circuit have consistently held that a plaintiff is required to provide evidence that the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence."  *Id*. at 258 (collecting cases).

Here, there is no evidence of any unreasonable delay on BLDG's part in offering soundproofing, nor any evidence of BLDG acting in bad faith or with malintent regarding the same.  Contrary to Plaintiff's assertion that the soundproofing was not offered for "six years," it is worth noting that Plaintiff's May 2017 Request Letter did not request soundproofing in the first place.  Rather, Plaintiff does not appear to have requested soundproofing until the filing of this action, *see* Compl., Statement of Relief ¶ 1, and, less than one month following an initial settlement

conference with Magistrate Judge Lehrburger, BLDG began offering soundproofing to Plaintiff repeatedly, as described above. *See Logan*, 57 F. Supp. 3d at 273 (finding no constructive denial of a reasonable accommodation where defendants delayed for four months and there was no evidence in the record of "discriminatory intent, bad faith, or obstructionism").

It is also notable that the record demonstrates that BLDG took repeated action in response to Plaintiff's earliest complaints in 2017.  As Plaintiff himself acknowledges, even prior to his formal May 2017 letter requesting reasonable accommodations, Defendants served legal notices on Newman, threatened to terminate her long-term rent regulated lease, and even commenced eviction proceedings against her in New York City Landlord-Tenant Housing Court over the alleged nuisance created by Mokie's barking.  *See* Pl. Decl. ¶ 97; Howard Reply Decl. ¶ 3, Ex. 41 (May 11, 2017 notice to cure letter sent to Newman); *id*. ¶ 4, Ex. 42 (notice terminating Newman's lease issued on July 24, 2017); *id*. ¶ 5, Ex. 43 (September 2017 holdover proceeding against Newman).  This prompt action is at the very least probative of BLDG's intent, and, rather than evincing any discriminatory motivations, demonstrates that BLDG was responsive to Plaintiff's concerns and quickly sought to take corrective measures.

In short, even were the Court to assume that BLDG was under any legal obligation to provide soundproofing as a reasonable accommodation in light of the particularized facts of the situation, BLDG plainly offered such an accommodation here.  On this record, no reasonable juror could find that the accommodation was not offered, nor could they thus find BLDG liable on Plaintiff's Section 3604(f)(3)(B) claim.  Summary judgment is therefore granted to BLDG on the soundproofing failure the accommodate claim brought under the FHA.

**B. Plaintiff's Claims of Discrimination via Disparate Treatment Fail**

Although it is somewhat unclear, Plaintiff also appears to raise a separate claim of discrimination by way of disparate treatment under the FHA.  The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person."  42 U.S.C. § 3604(f)(2).  It further makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate" on the basis of a "handicap."  *Id*. § 3605(a).  "To establish a prima facie case of discrimination under the disparate treatment theory, the plaintiff must present evidence that animus against the protected group was *a* significant factor" in an adverse action taken.  *McCulloc v. Town of Milan*, 559 F. App'x 96, 98 (2d Cir. 2014) (cleaned up).

Because no reasonable juror could find that Plaintiff was treated any differently than the Building's other tenants neighboring Newman's apartment, or that the Building or its employees intentionally discriminated against him, he does not state a prima facie discrimination claim under a disparate treatment theory.  Plaintiff does not even allege what disparate treatment he faced which was purportedly discriminatory.  And, as the undisputed record demonstrates, he was offered the same soundproofing services offered to other residents neighboring Unit 5C.  *See, e.g.*, Howard Reply Decl. ¶ 9 ("BLDG offered the same accommodation of soundproofing to Plaintiff that it offered to the other apartments that may have been affected by Mokie's barking, and did not at any time refuse the accommodation to Plaintiff.").  Accordingly, Defendants' motion for summary judgment on the FHA disparate treatment claim is granted.[4]

---

[4]     Indeed, even if the Court were to construe the Complaint as raising a disparate impact theory of liability, no reasonable juror could find in Plaintiff's favor, as the record demonstrates he was offered identical accommodations to those offered others of Newman's neighbors. *See Mhany Mgmt, Inc. v. Cnty. of Nassau*, 819 F.3d 581, 617 (2d Cir.

### C.  Plaintiff's Retaliation Claims Fail

Finally, no reasonable juror could find in favor of Plaintiff on his retaliation claims brought under the FHA.  The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed … any right granted or protected by section … 3604."  42 U.S.C. § 3617.  Put differently, as the Second Circuit has explained, the statute "safeguards members of the protected class from coercion, intimidation, threats, or interference in the exercise or enjoyment of their Fair Housing Rights."  *Frazier v. Rominger*, 27 F.3d 828, 833 (2d Cir. 1994).  To state a prima facie claim for retaliation, a plaintiff must establish that they (1) "engaged in protected activity, (2) the defendant was aware of this activity, (3) the defendant took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action."  *Ponce v. 480 E. 21st St., LLC*, 2013 WL 4543622, at *3 (E.D.N.Y. Aug. 28, 2013).  As with FHA discrimination claims, FHA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting standard.  *See Reg'l Econ. Cmty. Action Program v. City of Middleton*, 294 F.3d 35, 54 (2d Cir. 2002).  Accordingly, once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate rationale for the challenged action.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  If the defendant articulates a legitimate reason for the challenged action, the burden then shifts back to the plaintiff to demonstrate that retaliation for plaintiff engaging in a protected activity was the real reason for the action taken.  *See Walsh v. New York City Housing Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016).

Plaintiff's articulated bases for his retaliation claim are that Defendants purportedly

---

2016) (observing that, in order to state a disparate impact claim under the FHA, a plaintiff "must first establish … a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices").

retaliated against him by: (1) issuing the Ten (10) Day Notice to Cure in July 2021, and (2) sending the January 2021 letter offering him a list of suitable replacement apartments for rent.  *See* Pl. Decl. ¶ 123.  On this record, no reasonable juror could find that either constituted an adverse action taken by BLDG in retaliation for any protected activity under the FHA.

First, BLDG has adduced substantial record evidence demonstrating that it issued the Notice to Cure in July 2021 given repeated complaints about Plaintiff's disturbing behavior toward other tenants.  Among other things, the record reflects that Plaintiff: repeatedly made loud barking noises and screamed insults at Newman through the walls of his apartment, Howard Decl. ¶ 28, Ex. 27; harassed Newman, to the point that she called 911 regarding his behavior, *id.* ¶ 29, Ex. 29; repeatedly slammed doors, prompting multiple neighboring units to lodge complaints, *id.* ¶¶ 30–31, Exs. 19–20; stalked Newman in the hallway of the building, *id.* ¶ 36, Ex. 24; and played his radio at excessive volumes for more than twelve hours per day, *id.* ¶¶ 37–38, Ex. 25.  Given the well-documented evidence of these instances, among many others, BLDG certainly has come forward with a legitimate, non-discriminatory rationale supporting its issuance of the Notice to Cure.  *See Favourite v. 55 Halley Street, Inc.*, 381 F. Supp. 3d 266, 280 (S.D.N.Y. 2019) (dismissing retaliation claim where defendants "proffered sufficient evidence to demonstrate that they had a legitimate non-discriminatory reason for sending the Notice to Cure," given that the "record [was] replete with numerous complaints about excess noise purportedly emanating from Plaintiff's apartment").  Moreover, Plaintiff offers no evidence for how the Notice to Cure had a materially adverse effect upon him, such that it could even constitute an "adverse action" for FHA purposes in the first instance.  *See Cain v. Rambert*, 2014 WL 2440596, at *6 (E.D.N.Y. May 30, 2014) ("To be actionable, an adverse action must have some materially adverse effect on the plaintiff.") (cleaned up).  To the contrary, there were no material detriments nor any purported

25

chilling effect here, as Plaintiff continued to prosecute this action and zealously assert his claims of purported FHA violations long after the Notice was served.

Second, as to the claim that BLDG's letter offering Plaintiff other suitable apartments somehow constituted retaliation, the record evidence demonstrates that the offer was made in good faith in an effort to *accommodate* Plaintiff given his complaints about the disruptive noise coming from Unit 5C. *See supra* at Section I(A)(1). Plaintiff himself specifically lists this accommodation as the first relief that he seeks should he prevail in this action. *See* Compl. at 11 ¶ 1 ("Mr. Blitz is seeking injunctive relief, namely, the reasonable accommodation of being moved to a unit away from the barking dog . . . ."). And it is the same accommodation first listed in Plaintiff's formal May 2017 Notice of Request to BLDG. *See* Def's Ex. 12 at 1 ("As an accommodation for Mr. Blitz's disabilities so that he can access and use his home, we request that the Building's owner transfer Mr. Blitz to a similar, rent-regulated apartment elsewhere in the Building . . . ."). That the units he was offered in BLDG's January 2021 letter may have had higher rents than Plaintiff paid for Unit 5D is irrelevant in assessing whether it constituted an adverse action taken in retaliation for Plaintiff's FHA complaint. *See supra* at 16–18 (demonstrating Plaintiff is not entitled to a rent subsidy as a reasonable accommodation pursuant to the FHA). Accordingly, Defendants' motion for summary judgment as to the retaliation claims brought under the FHA is granted.

### D. Because Plaintiff's FHA Claims Fail, the Court Need Not Reach Defendants' Theories in the Alternative

Defendants' motion and reply also raise a litany of theories which they contend, in the alternative, arguably preclude Plaintiff's FHA claims in this action. They argue, for instance, that Plaintiff is precluded from raising FHA claims in this Court for harms arising from the same alleged failure to accommodate that was the subject of Plaintiff's earlier complaint in the Housing Court Action. *See* Mot. at 7–10; Reply at 24–28. Under any of the Court-developed prudential

26

doctrines of (1) *res judicata*, (2) claim preclusion, or (3) the *Rooker-Feldman* doctrine, they contend that Plaintiff is barred from asserting claims against Defendants for any failure to accommodate prior to May 8, 2019, the date the Housing Court Settlement was approved.  Finally, they argue that Plaintiff is also barred by the FHA's two-year statute of limitations from raising claims for any harms he allegedly suffered under that statute arising prior to July 15, 2018, two years prior to the date that he filed his Complaint in this Court.  *See* Reply at 7–8; *see also* 42 U.S.C. § 3613(a)(1)(A) (providing that "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice").

Because the Court finds that, in any event, given the undisputed facts in the record, no reasonable juror could find in Plaintiff's favor on his FHA claims, it need not reach the questions of whether the earlier Housing Court Action precludes Plaintiff's claims here, or whether the continuing violations doctrine allows his claims to survive the FHA's statute of limitations.

### III.    The Court Declines to Exercise Supplemental Jurisdiction Over Any State Law Claims Plaintiff's Complaint Asserts

Although federal courts may exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over state law claims which are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III," the exercise of such jurisdiction is discretionary.  *Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 121–22 (2d Cir. 2006); *see also Valencia ex rel. Franco v. Lee*, 316 F.3d 299 (2d Cir. 2003) (affirming a district court dismissing state-law claims in an opinion granting summary judgment after declining to exercise supplemental jurisdiction).  A district court may decline to exercise supplemental jurisdiction, for instance, where the claims to which it had original jurisdiction are dismissed.  *Id.* at 122 (citing 28 U.S.C. § 1367(c)(3)).  In determining whether the exercise of supplemental

27

jurisdiction would be proper, courts balance the interests of judicial economy, convenience, fairness, and comity. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). In the typical case in which all claims brought under federal law have been dismissed, the balance of factors will tend to weigh in favor of declining to exercise jurisdiction over the remaining state law claims. *Id.* at 350 n.7; *see also Carroll v. Rondout Yacht Basin, Inc.*, 2014 WL 4966124, at *6 (N.D.N.Y. Oct. 3, 2014) (observing that courts will typically decline to exercise supplemental jurisdiction in such instances).

Having determined that no reasonable juror could find in Plaintiff's favor as to any of his claims brought under the ADA or FHA, the Court declines to exercise supplemental jurisdiction over any remaining state law claims here, and therefore dismisses the remainder of his Complaint in its entirety.

## IV.     The Third-Party Claims Against Newman are Dismissed as Moot

Finally, because Defendants' motion for summary judgment is granted, and Plaintiff's motion is denied, Defendants' third-party claims against Wendi Newman (and her motion for summary judgment on the same) are moot. The Third-Party Complaint brought by Defendants seeks common law or contractual indemnification or contribution to the extent that Defendants are held liable on any of Plaintiff's causes of action. *See* Dkt. 19 at ¶ 13 ("*If, however, the Court finds in favor of Blitz* … the Landlord asserts that it is entitled to relief from Newman on the theory of common law indemnification or contribution or contractual indemnification or contribution pursuant to the lease between the parties.") (emphasis added). Having determined that Defendants are not liable to Plaintiff on any of his claims as a matter of law, any arguments they have made seeking indemnification by Newman are therefore moot. *See S.A.R.L. Orliac v. Winebow, Inc.*, 595 F. Supp. 470, 473 (S.D.N.Y. 1984) ("Third-party defendant's motions are contingent on the

availability of Winebow's claim for indemnification.  If there is no primary liability, Winebow's claim is moot and third-party defendants' motions are moot.").

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted, Plaintiff's cross-motion denied, and Defendants' Third-Party Complaint is dismissed as moot.  The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 111, 129, and to close this action.  The Clerk of Court is further directed to mail a copy of this Memorandum Opinion and Order to Plaintiff Blitz.

SO ORDERED.

Dated:     September 21, 2023
           New York, New York

_____
Hon. Ronnie Abrams
United States District Judge